**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| MITCHELL ROSAS-REYES[1]<br><br>Plaintiff,<br><br>v.<br><br>O'KEEFE MEDIA GROUP<br>c/o PHS Corporate Services, Inc.<br>1313 N. Market Street, Ste. 1000<br>Wilmington, Delaware 19801<br><br>and<br><br>JAMES O'KEEFE<br>c/o PHS Corporate Services, Inc.<br>1313 N. Market Street, Ste. 1000<br>Wilmington, Delaware 19801<br><br>and<br><br>DOMINIQUE PHILLIPS[2]<br><br>Defendants. | * | Civil Action No. 26-________ |

* * * * * * * * * * * *

**<u>COMPLAINT</u>**
**<u>(Trial By Jury Requested)</u>**

This civil action casts a further light on the disturbing practice of secretly recording a non-public figure who has been intentionally defrauded to believe they are on a personal date and merely engaging in a private conversation on matters of public concern. In reality, the situation is a honeytrap for the purpose of subsequently widely releasing selected embarrassing or salacious audio or video clips with false commentary knowing it will likely lead to the victim's firing.

---

[1] Pursuant to Local Civil Rule 5.1(c)(1), the Plaintiff's residential address is being contemporaneously filed under seal with the Court in a separate Notice of Filing.

[2] As a courtesy to Ms. Phillips, her home address is not being publicly listed and will also be filed under seal with the Court in a separate Notice of Filing.

Those targeted are typically government officials or contractors whose expression of personal opinions on matters of public concern are distorted to suggest the information is based on inside information learned through their employment. Though couched under the guise of journalism, these activities are primarily, if not solely, designed for right-wing ideological activist purposes and to generate revenue.

Plaintiff Mitchell Rosas-Reyes ("Mr. Rosas-Reyes") brings this action seeking damages for civil tort claims of defamation, false light, fraudulent misrepresentation, conspiracy to commit fraudulent misrepresentation, tortious interference with employment relationship, and violation of the Federal and District of Columbia ("D.C.") Wire Tap Acts against three Defendants: O'Keefe Media Group ("OMG"), James O'Keefe ("O'Keefe") and an OMG undercover operative, Dominique Phillips ("Phillips", also known as "Skylar").

**JURISDICTION**

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a). The parties are citizens of different states and the amount in controversy exceeds $75,000.

2. This Court has personal jurisdiction over this action given that the tortious injuries occurred in the District of Columbia.

**VENUE**

3. Venue is appropriate under 28 U.S.C. § 1391(b)(2) as the tortious injuries occurred in the District of Columbia.

**PARTIES**

4. Plaintiff Mr. Rosas-Reyes is a United States ("U.S.") citizen and private figure. He previously worked as a government contractor for the Federal Bureau of Investigation ("FBI") as

a Senior Paralegal Specialist. He has held a security clearance with the U.S. Government since 2011.

5. Defendant O'Keefe Media Group ("OMG") is a Limited Liability Corporation organized in the State of Delaware and listed under File Number 7304748. The date of incorporation for OMG is listed as February 17, 2203, and its headquarters appears to be based in West Palm Beach, Florida, although an actual public address for OMG is not available. Its sole known member is Defendant O'Keefe.

6. Defendant O'Keefe is a U.S. citizen and, upon information and belief, a resident of the State of Florida. A publicly listed personal mailing address for O'Keefe is not currently available. Up until February 2023, he was the CEO and founder of Project Veritas, which routinely engages in similar conduct as described within this Complaint. He was removed and/or left from Project Veritas in February 2023 due to alleged "financial malfeasance" related to his use of "an excessive amount of donor funds" on personal luxuries and subsequently created OMG. In 2010, he criminally pled guilty to unlawfully entering federal property.

7. Defendant Phillips is a U.S. citizen and, upon information and belief, currently resides in the State of Arizona. She graduated from college in 2024 and previously worked for the conservative organization Turning Point USA. At the time of the events in question, she was an OMG employee, associate, or contractor and is known to have participated in multiple undercover honeypot operations for the other two Defendants.

## FACTS

### *Mr. Rosas-Reyas*

8. Mr. Rosas-Reyes is a first generation American who grew up in South Central Los Angeles. As a young man he experienced death threats and violence, lost family members and

friends to gang violence while living in an economically disadvantaged community. Despite difficult odds, he successfully graduated from high school and went on to attend college where he excelled academically and graduated with a double bachelors degree in Political Science, with a concentration in Global Politics, and Economics. His goal of a career in public policy and service was born from his dream of escaping his challenging childhood and contributing to his country.

9. After college, he began post-graduate studies and graduated with a Master of Public Administration degree in 2011. Following completion of his graduate degree, Mr. Rosas-Reyes moved to Washington, D.C., served as an intern at the Department of State and eventually found work as a contractor for various federal agencies to include the Department of Homeland Security, the Department of State, the FBI and the United States Agency for International Development. Much of his professional experience has been handling Freedom of Information Act matters and legal operations. In March 2025, he was hired by the federal contractor Guidehouse (*https://guidehouse.com/)* to work as a paralegal on a contract with the FBI. He began his work with the FBI at its Headquarters in Washington D.C. in April 2025 and was assigned to a team within the Office of the General Counsel.

10. At the FBI, Mr. Rosas-Reyes supported tasks to include litigation readiness, eDiscovery, and records compliance. He worked in a cubicle under the supervision of a Guidehouse project manager ("PM") and deputy project manager ("DPM"), as well as with an FBI senior discovery counsel. An FBI contracting officer's representative ("COR") worked with his team to coordinate between Guidehouse and the FBI. Mr. Rosas-Reyes enjoyed his work with the FBI, which he found meaningful and challenging, and he never had any performance issues. Both the

COR and the senior discovery counsel informed him on more than one occasion that they were very pleased with his performance and his contributions to the team.

***Hinge Dating App***

11. Mr. Rosas-Reyes, as with untold numbers of Americans, has used various dating apps, including Hinge, in an effort to meet with and hopefully develop a romantic connection with interesting, smart, and attractive women who share his values.

12. When creating an account using Hinge, every user must agree to the company's Terms of Use Agreement and Community Guidelines. Under the Terms of Use Agreement, users must be over 18 years of age and legally qualified to enter into a contract with Hinge. They may not have committed, been convicted of, or have plead no contest to crimes of violence or sexual misconduct, may not have other accounts on Hinge, and must not have been previously removed from Hinge's services. Users must agree they will not misrepresent their identity, age, employment, qualifications, or affiliations with another person or entity. They are prohibited from defaming others, may not use another's account or share their account with another, and may not use Hinge in relation to any fraud or similar practice.

13. Hinge's Community Guidelines emphasize three primary values it expects users to uphold: authenticity, courage, and empathy. Critically, users are required to be themselves. "Hinge is built for real people looking for real connection. That means showing up authentically and with clear intentions." *See* Community Guidelines at *https://help.hinge.co/hc/en-us/articles/43072641158547-Community-Guidelines#* (last viewed August 26, 2026). Furthermore, the Guidelines require users to date with genuine intentions: "Hinge is a place for intentional dating, not manipulation or coercion. We don't allow scams, impersonation, or any

kind of manipulation for personal or financial gain." *Id.* Finally, Hinge users are required to keep their interactions honest – false information and fake profiles are not allowed.

14. Mr. Rosas-Reyes' profile on Hinge included his name and that he was looking for a long-term relationship and believed in monogamy. He identified himself as liberal and stated "I value openness, honesty, and thoughtfulness because I believe genuine connections are built on mutual understanding and respect. I am interested in the stories and insights that make you uniquely you." As part of his profile, he included a number of authentic personal pictures.

***Mr. Rosas-Reyes Connects with "Skylar"***

15. Sometime prior to on or about Friday, July 11, 2025, Defendant Phillips created a false profile on the dating application Hinge under the screenname "Skylar." Upon information and belief, she created this account based on training and direction from Defendants OMG and O'Keefe. In creating her Hinge profile, Defendant Phillips was required to affirmatively agree to Hinge's Terms of Use Agreement and to abide by Hinge's Community Guidelines. But her intent from the beginning in creating this Hinge account was to falsely portray herself as someone she was not for the purposes of defrauding and manipulating users as a type of honeypot, and she did so on multiple occasions for Defendants OMG and O'Keefe. Upon further information and belief, her actions to fraudulently misrepresent herself had the potential or did result in her being financially compensated.

16. On or about Friday, July 11, 2025, Defendant Phillips "liked" Mr. Rosas-Reyes's profile on Hinge, which prompted a notification to him. He was able to review the fake profile Defendant Phillips had created for "Skylar." When Mr. Rosas-Reyes looked at the information Defendant Phillips had created for "Skylar," he saw someone who identified herself as spiritual, liberal, and seeking a long-term relationship (though open to short-term) and monogamy. He

noted a shared interest in health and fitness and trying new restaurants. In her profile "Skylar" stated that she was 23 and worked as a nanny, and that the one thing she would want to know about a match is what career they were in. After reviewing this intentionally false information, and believing they had similar interests and beliefs, Mr. Rosas-Reyes picked one of her photos and liked it back. Later that same day he received a response from "Skylar", saying "Heyyyy youuu" with two heart emojis.




17. The next day, July 12, 2025, Mr. Rosas-Reyes exchanged further messages with Defendant Phillips. In her fourth message, "Skylar" asked what he did for work. Mr. Rosas-Reyes initially responded with personal questions as to where she was from, what she did with her family, etc. He then informed her he was a consultant at the Department of Justice ("DOJ") and asked how she liked being a nanny. Defendant Phillips responded that she was originally from California (which, upon information and belief, was false), enjoyed going out to eat and hanging out with her family and working with kids, and then immediately pivoted back to work related questions regarding how long he had been a DOJ consultant. Mr. Rosas-Reyes noted that he was also from California and said that while he had started at DOJ a few months earlier he had been working for the federal government for a while. The two exchanged additional messages over the next several days and discussed the type of personal and professional details individuals would routinely disclose with each other prior to first meeting. Eventually, they exchanged cell phone numbers as well.

18. Defendant Phillips and Mr. Rosas-Reyes agreed to meet at 7:30 pm on Saturday, August 2, 2025, for drinks. Mr. Rosas-Reyes suggested a bar he liked, but Defendant Phillips

instead asked if they could go to the restaurant El Rey at the Navy Yard, Washington, D.C., as she claimed it was a place she liked and she emphasized she would love to take him there. Mr. Rosas-Reyes agreed.

***First Date***

19. Mr. Rosas-Reyes arrived at El Rey just before 7:15 pm and found Defendant Phillips already there in the outdoor area. Upon his arrival, Defendant Phillips gave Mr. Rosas-Reyes a friendly hug. His initial impression was that she was very nice and actually seemed interested in learning more about him, his family, and his interests. They ordered drinks, for which Mr. Rosas-Reyes paid $34.39.

20. There were other patrons sitting in the same outdoor area talking with each other and there was loud music playing in the background, all of which created a very noisy environment. Mr. Rosas-Reyes did not have any reason to believe other individuals around them could clearly hear, or were listening to, his conversations with Defendant Phillips. As a result, he felt free to engage in personal conversations with her that were always intended to be private.

21. At some point in the conversation Defendant Phillips brought up media reports about the criminal conduct of Jeffrey Epstein ("Epstein"), who had died in jail in New York in 2019 while awaiting trial related to his sexual abuse and sex trafficking of woman, many of whom were underage. It was well known that while campaigning for president, President Trump had promised to release all the files related to the federal criminal investigations of Epstein and his associates. At the time of Mr. Rosas-Reyes date with Defendant Phillip, the promised release of the files had not occurred and public attention regarding the "Epstein files" was very high. Media reporting was then focused on whether there was a "list" of clients or associates of Epstein who had engaged in similar abuse of women, and on the FBI and DOJ's efforts to review over

100,000 pages of Epstein documents. *See e.g. https://www.nytimes.com/2025/07/21/ us/politics/trump-epstein-maga-base.html?searchResult Position=2* (last accessed August 26, 2026); *https://www.nytimes.com/2025/07/24/us/politics/ epstein-files-trump-bondi-justice-department-fbi.html* (last accessed August 26, 2026).

22. Defendant Phillips specifically asked Mr. Rosas-Reyes if he worked on anything related to Epstein in his job. He informed her, truthfully, that he did not have anything to do with the Epstein case or the Epstein files. She expressed how upset she was over what Epstein had done to so many women and how important it was that the files be released. Mr. Rosas-Reyes, having already informed her that he had no professional role or inside information related to the Epstein files, then engaged in a private discussion where he repeated information from media reporting and other publicly accessible information that was available at the time, that the files were being withheld to protect some people and that there were also Democrats on the Epstein lists, including possibly former President Clinton. He also stated his personal opinion that the FBI was doing what it was told to do in terms of releasing the files and that he believed the information would eventually come out, but probably not during the current administration.

23. The date lasted approximately two hours. While they discussed other topics, Defendant Phillips repeatedly brought up the Epstein case. When Mr. Rosas-Reyes tried to steer the conversation to topics he was more interested in, Defendant Phillips would return to the Epstein topic and he began to get the impression that she was obsessed with the matter. But given the amount of media attention this topic was receiving at the time, and especially in Washington, D.C., nothing about their initial conversation seemed unusual to Mr. Rosas-Reyes. In fact, Mr. Rosas-Reyes had been on other dates where the topic was discussed. At the end of the date Defendant Phillips, still falsely posing as "Skylar," gave him another hug and they parted

ways. She even messaged Mr. Rosas-Reyes later that night to make sure he had arrived home safely.

***Second Date***

24. The next day, Sunday, August 3, 2026, Defendant Phillip, continuing to fraudulently misrepresent herself as "Skylar", texted Mr. Rosas-Reyes saying she had a wonderful time on their date, loved talking to him, and asked if he was available the next day to do something together. They exchanged various texts and ultimately agreed to meet after Mr. Rosas-Reyes finished work on Monday, August 4, 2026. At Mr. Rosas-Reyes' suggestion, they agreed to meet for dinner at a chain restaurant called Seoul Spice located in Washington, D.C. and then go for a walk around the nearby National Mall.

25. Once again, Defendant Phillips arrived prior to Mr. Rosas-Reyes and was waiting for him when he arrived at the restaurant. They waited in line to order food and Mr. Rosas-Reyes again paid the bill, which came to $33.84. The restaurant was mostly empty and they sat in a corner booth away from any other patrons. Mr. Rosas-Reyes reasonably believed their conversation was private and that no one around them could hear what they were saying.

26. The dinner portion of their date lasted approximately 20-30 minutes and then they walked around the National Mall in Washington, D.C. for about 30-40 minutes. During the course of their date, Defendant Phillips brought up the Epstein topic on more than one occasion.
Mr. Rosas-Reyes emphasized again that that he did not have any non-public information related to Epstein and sought to change the subject. Eventually Defendant Phillips claimed she received a call from a friend who was in the area and had an emergency and needed her help. She said she had to leave, gave him another hug, and departed.

27. Mr. Rosas-Reyes had no further contact with Defendant Phillips after that evening. He believed she had made an excuse to leave their walk early. While he found her to be friendly, he did not feel any intimate connection. He was also frustrated with her repeated questions about his knowledge regarding Epstein. Because something seemed odd about these interactions, he took a screenshot of her Hinge profile that evening to keep a record. He did not attempt to contact her again, and he was not surprised that she never reached out either.

*Contact with Defendant OMG*

28. One month later, on or about Friday, September 5, 2025, Mr. Rosas-Reyes received a text message on his personal cell phone at approximately 3:28 am. He did not see it until later in the morning after he had woken up and was getting ready to leave for work. The phone number was from area code 551, which is tied geographically to northeastern New Jersey and was not a phone number that Mr. Rosas-Reyes recognized. The text was from an individual who identified themselves as "Raider" and claimed they were a journalist with Defendant OMG. "Raider" claimed he was planning on posting "a leaked audio tape" of Mr. Rosas-Reyes "speaking about new details in the Jeffrey Epstein Case." The text further stated that Mr. Rosas-Reyes, as a "Senior Specialist official for the DOJ/FBI spoke about how the Epstein Files would not be released until this administration is over, and claim there are a lot of powerful Democrats on the list." The message also claimed Mr. Rosas-Reyes had also said "there is something being covered up in the Epstein case" and that "DOJ is covering for someone or some people." The text stated they had an 11:30 am deadline and wanted his comment on the matter, and that they had already reached out to DOJ and FBI about his comments. Finally, it provided various direct quotes that were being attributed to him. The texts made no mention of "Skylar" or that this

related to a private conversation he had on a "date" a month prior. A true and correct copy of the text message up to the cited quotes is reproduced here:




29. Mr. Rosas-Reyes had never heard of Defendant OMG before receiving this text. While the message did not name "Skylar", Mr. Rosas-Reyes was very suspicious it was related to her based on how she acted on their dates and her persistent questions about Epstein. When he checked Hinge for her profile, it was no longer available. Because he needed to get to work, he decided he would deal with the matter later. He did not see a second text from "Raider" that was sent at 10:29 am, which asked again if he had any comment, until later that day.

*Termination from FBI and Guidehouse*

30. Just past 2:30 pm in the afternoon of September 5, 2025, Mr. Rosas-Reyes' DPM informed him that the PM wanted to speak with him via telephone, asked him to remove his badge from his work computer's card reader, lock his computer, and go with him. Mr. Rosas-Reyes asked the DPM what this was regarding and the DPM told him he could not say what the issue was about. While waiting, the COR and three other people arrived and escorted Mr. Rosas-

Reyes to his desk and asked him to take as many of his items as possible with the rest to be shipped to him later. He then met with the Chief Security Officer ("CSO") and was told he was being removed from the FBI contract due to "suitability issues" and that he would be escorted out of the building. Mr. Rosas-Reyes asked the CSO the reason for his removal, but the CSO stated that he had no further information beyond the "suitability issue." The COR emphatically stated in front of the CSO that this had nothing to do with Mr. Rosas-Reyes' performance. He was then taken to a rear exit in the building where the COR escorted him out and they shook hands before Mr. Rosas-Reyes departed with his belongings. The process felt surreal to Mr. Rosas-Reyes, almost like something out of a movie that happens to someone who has committed a crime.

31. After being escorted out of the building Mr. Rosas-Reyes went to a tea shop nearby to sit and process what had just happened. He was rattled by the experience and the potential implications for his career. He was also worried about what was going to be published about him, as well as how it would impact him personally, professionally and financially. He felt that everything he had been working so hard to achieve over the past fifteen years, and really his entire academic life, had been destroyed without explanation.

32. While at the tea shop, he reached out to a co-worker to tell him what had happened and asked if he could retrieve some items Mr. Rosas-Reyes had left in his cubicle. The friend met Mr. Rosas-Reyes at the tea shop and stated that he had been told by an FBI attorney he passed in the hall something to the effect that his co-worker (Mr. Rosas-Reyes) should not be talking to journalists and to be on the lookout for a publication by OMG later that day.

33. While at the tea shop, Mr. Rosas-Reyes also received a phone call from his PM and a Guidehouse HR representative. They informed him he was under investigation for a potential

ethics violation and would be put on paid administrative leave pending the investigation results. They noted he would receive a follow-up e-mail on next steps. They did not elaborate on what type of ethics violation he was alleged to have committed even though he asked for more information.

34. When he arrived back home that evening, Mr. Rosas-Reyes took the time to look up Defendant OMG. He found articles online about Defendants OMG and O'Keefe and reviewed their website. He then sent a follow-up text at 7:19 pm to the person calling themselves "Raider" and stated that he formally objected to the publication of any information. He made it clear that he was "not a government official and was not speaking on behalf of anyone but himself." He also wrote that he was never informed his conversation had been recorded, that he believed the quotes were a fabrication and that what Defendant OMG claimed was not reflective of what he had actually said. He stated that he did not consent to the publication, and that any portrayal otherwise would be "false, misleading, and damaging." After again telling Defendant OMG not to publish anything, he provided an e-mail address he created for the purpose of this exchange and asked that any further communication be in writing to that e-mail. He sent a similar message to an e-mail address he found on Defendant OMG's website and to their "Contact Us" page, which he addressed to the Editor-in-Chief, Managing Editor, and Legal Department. In each of these communications he repeated that he was not a government official, that he disputed the claimed quotes, and that publication would be defamatory, among other torts.

35. Sometime after sending the e-mail he received two more phone calls from a phone number labeled, "O'Keefe Media Group, New Jersey." He did not answer either call as he had made it clear he would only communicate in writing via the e-mail address he had provided.

36. At or around noon, Monday, September 8, 2025, Mr. Rosas-Reyes participated in a video interview that lasted approximately ninety minutes with two individuals from the Guidehouse Ethics department. They initially asked if he knew what the investigation was regarding and he said he did not but suspected it was related to a pending publication by Defendant OMG. Their questions focused entirely on his date with "Skylar." He answered all the questions he could and did so truthfully. They did not address any other subject with him, nor did they cite any specific company regulation or policy he may have violated. After the call he e-mailed them screenshots from "Skylar's" profile, as they had requested.

37. Later that afternoon, Mr. Rosas-Reyes received a phone call from Guidehouse's HR department to inform him he was being terminated as of that day. The only stated basis for the termination was vaguely "what happened with the client," by which he understood referred to his removal from the FBI contract due to the actions of the Defendants. He never received any written notification of his termination from Guidehouse.

*Publication of Video of Secretly Recorded Audio by Defendants*

38. On or about September 8, 2026, Defendants OMG and O'Keefe, with the participation, or at least consent, of Defendant Phillips, published a video ("Video") on various social media platforms and websites that contained selective audio clips of Mr. Rosas-Reyes ("Secretly Recorded Audio"). Upon information and belief, these audio recording clips were made secretly by Defendant Phillips while she was on the first date with Mr. Rosas-Reyes, who was without knowledge of the recording and had not consented to being recorded.

39. Upon information and belief, Defendant Philips was paid for her efforts and made the recordings secretly at the request of Defendants OMG and O'Keefe with the knowledge they might be publicly posted online. Upon further information and belief, she also provided

Defendants OMG and O'Keefe with information about Mr. Rosas-Reyes that she learned through their Hinge interactions, such as his cell phone number, and during their two dates, all of which was obtained as part of her fraudulent misrepresentation honeypot scheme where she falsely portrayed herself as "Skylar."

40. Upon information and belief, the Defendants never conducted any investigation to determine what type of work Mr. Rosas-Reyes actually performed at the FBI or for Guidehouse or verified whether his statements to Defendant Phillips that he did not work on any Epstein related matters were true. In fact, had they done so they would have learned, among other things, that Mr. Rosas-Reyes had nothing to do with the Epstein files or case.

41. Defendants OMG and O'Keefe posted the Video of the Secretly Recorded Audio to multiple platform locations. This included the organization's YouTube channel at *https://www.youtube.com/watch?v=p8LX031AdXA*, which as of the time of the filing of this Complaint has over 455,000 subscribers. The Video of the Secretly Record Audio has been viewed there over 31,460 times, received over 3,300 likes and more than 540 comments. It was also posted on Defendant O'Keefe's X (formerly Twitter) account at *https://x.com/JamesOKeefeIII/status/1965127261524307970?s=20*, which as of the time of filing of this Complaint has over 3.5 million followers. That posting of the Video of the Secretly Recorded Audio has been viewed over 1.9 million times, liked over 6,800 times, reposted 3,200 times, and commented on more than 360 times. The same Video of the Secretly Recorded Audio was also posted on their Instagram account at *https://www.instagram.com/reels/DOWhaVbiada/*, which as of the time of filing of this Complaint has 1.6 million followers. The Video of the Secretly Recorded Audio has received over 1,060 likes and 26 comments. Finally, the Video of the Secretly Recorded Audio was also posted to their Facebook account at

*https://www.facebook.com/share/v/1EHy5SKSZr/*, which as of the time of the filing of this Complaint has over 245,000 followers. There, the Video has received over 1,200 likes, 250 reposts and 100 comments. The Video of the Secretly Recorded Audio can also be viewed on OMG's website at *https://okeefemediagroup.com/fbi-epstein-coverup-mitchell-rosas*, but no viewer metrics are available. The time stamp on the X post indicates it was uploaded at 2:57 pm. Upon information and belief, the Video of the Secretly Recorded Audio was posted at approximately the same time on the other sites.

42. The Video posted on YouTube and the OMG website is approximately four minutes and eleven seconds long (the OMG version is actually one second longer due to an embedded picture linking to the YouTube version), while the version of the Video on X, Instagram, and Facebook is four minutes long. Unless otherwise noted, the description that follows is of the longer version. Both Videos include selective clips from the Secretly Recorded Audio of Defendant Phillips, while fraudulently misrepresenting herself as "Skylar," talking with Mr. Rosas-Reyes. In the background can be heard loud music playing and the muffled sounds of other indistinguishable voices. Upon information and belief, the short and selectively edited clips from the Secretly Recorded Audio played in both versions of the Video were all taken from the first date, which lasted over two hours. It is unknown whether – but it is suspected that – Defendant Phillips also secretly recorded the second date with Mr. Rosas-Reyes without his consent or knowledge which lasted over an hour.

43. The opening title of the longer Video features a graphic with the FBI logo at the upper left corner and OMG's logo in the other three corners. At the bottom of the screen the text reads "SUBSCRIBE FOR BREAKING NEWS @OKEEFEMEDIAGROUP.COM."

44. As the longer Video begins, the voice of Defendant Phillips, fraudulently misrepresenting herself as "Skylar," can be heard asking "People may not get what they're looking for out of this whole like Epstein stuff?" The Video then cuts to the voice of Mr. Rosas-Reyes stating, "It's clear that they're covering something and protecting someone or some people. There are a lot of powerful Democrats that are also on that list. There's definitely something being held back. I don't think it's going to come out until this administration is over." As Mr. Rosas-Reyes speaks, a picture of him from his Hinge profile appears on screen along with his name, listed as "Mitch R. Rosas", and the title of senior technical paralegal specialist FBI. In the ten second shorter Video, the initial question by Defendant Phillips is omitted, and the Video starts with the image of Mr. Rosas-Reyes with the same name and title, and then the same answer to Defendant's Phillips' question in the longer version. When the audio of Mr. Rosas-Reyes' speaking finishes, the video graphics change and the FBI logo moves to the middle of the screen with the words "THE FBI LEAKS" above and "PART TWO" below." This short graphic sequence is missing from the shorter version of the Video on X, Instagram and Facebook.

45. At this point both versions of the Video feature Defendant O'Keefe speaking. He opens by referencing a similar video posted just a few days prior on September 4, 2025, that pertains to a different federal employee also speaking about Epstein during a similar fake date (Defendant O'Keefe is referring to another undercover operation that his organization and Defendant Phillips conducted against Joseph Schnitt, which is the subject of litigation in *Schnitt v. Blanche et al.*, Civil Case No. 25-4111 (D.D.C.)(CRC) and also being handled by the undersigned). Defendant O'Keefe claims that the recent story regarding the other individual "has already prompted additional insiders to come forward." He then states, "Thanks to an insider from within the FBI, OMG has obtained new, exclusive audio. This time, FBI Analyst Mitchell Rosas admitting that

the Bureau and the Administration is covering up the Epstein Files." As he speaks, the image of Mr. Rosas-Reyes reappears and then the Video returns to the same audio of Defendant Phillips asking the question that was omitted from the shorter Video. This time, however, upon information and belief, the audio of the conversation at the start of the Video seems to have been edited because Mr. Rosas-Reyes's reply in both versions is different than how it was played the first time. He is recorded as saying, "I think the problem is that none of the people that are in a position to answer the questions are willing to do it because …" before continuing with the statement in the original cut of his answer at the beginning of the video, "it's clear they're covering something and protecting someone or some people." At this point the audio is again cut, and jumps to him saying, "especially because it's like we're gonna release everything on JFK, we're gonna release everything on MLK, we're gonna release everything on Epstein, and next thing you know it's like, oh, never mind, um, we found some" and here it appears there is a cut to "or it's like, op, oh no, it turns out there is no list even though we've been claiming this entire time that there." – The end of his sentence was abruptly cut off.

46. While it is unknown if Defendants' earlier September 4, 2025, Video prompted any "insiders" to "come forward" to Defendant OMG with any type of verifiable information, it is certain that the "new, exclusive audio" of Mr. Rosas-Reyes speaking while on his private "date" with Defendant Phillips was not provided by an "insider from within the FBI." In making this false statement, Defendants misleadingly portray the statements of Mr. Rosas-Reyes as being official FBI information rather than the opinion of a person who just happens to have worked as a contractor at the FBI and who had no connection to the Epstein matters, let alone "inside information."

47. As the Secretly Recorded Audio is played, the Video includes a graphic with a transcription of what is being said. In the transcription, however, words are added in brackets and impugn to Mr. Rosas-Reyes a different meaning than what he is saying in the audio. For instance, when he is stating "it's clear that they're covering something up" the transcription on the screen says, "IT'S CLEAR THAT THEY'RE [WHITE HOUSE] COVERING SOMETHING UP." The transcript claims Mr. Rosas-Reyes specifically refers to the White House two more times when not once in the Secretly Recorded Audio does Mr. Rosas-Reyes identify who or what he was referring to with his comment.

48. By inserting "[WHITE HOUSE]" into the transcript, the Defendants' videos falsely portray Mr. Rosas-Reyes claiming as a factual matter that the White House, i.e., the Trump Administration and by implication the President, is covering something up. And that this is new information obtained from an FBI insider. In fact, Mr. Rosas-Reyes told Defendant Phillips he had no inside information about the Epstein matter or knew what the government was doing about it and his personal comment reflected nothing more than the general opinion that many people held, both on the Left and the Right.

49. At this point in the Video it cuts back to Defendant O'Keefe saying, "On this hidden recording Rosas ***confessed*** there's definitely something being held back," and then he stated that when "pressed on why Rosas ***admitted,*** *quote****,*** a lot of powerful Democrats are on that list." (emphasis added). The video then plays another clip of the Secretly Recorded Audio of Mr. Rosas-Reyes saying, "The whole thing is just so disjointed that it makes it super obvious that there's something being covered up. And it's making it blatantly obvious in the minds of, I think, any rational non-fanatic that what other reason would there be for not releasing it? If you think about it, sort of you follow like logical progression. Like basic sort of like Socratic method,

there's definitely something being held back and frankly, I don't think it's going to come out until this administration is over." The audio continues with Defendant Phillips asking, "Do you think the FBI is doing everything that they possibly can or do you think they're just like, kind of protecting each other internally?" Mr. Rosas-Reyes replies, "I mean, I think they're doing everything they're being told that they are supposed to do." The use of such damning words as "confessed" and "admitted" by Defendants OMG and O'Keefe impute that Mr. Rosas-Reyes was revealing inside information that was part of some government cover-up.

50. The Video then cuts to a different clip that had previously been played at the start of the Video where Mr. Rosas-Reyes is stating, "There are a lot of powerful Democrats that are also on that list." This time however, unlike the version played at the start of the Video, the Secretly Recorded Audio cuts to Defendant Phillips asking, "Like who?" followed by Mr. Rosas-Reyes responding, "I mean, like the first one I've heard named is, uh, Bill Clinton. He still like carries a lot of like influence in the party. And so because of that, I don't think that the party and so because of that, I don't think that the party would be willing to expose him in that way."

51. Both versions of the Video then turn to Defendant O'Keefe asking why the American people should wait for the truth and stating, "The American people deserve to know and see the full unvarnished, unfiltered, unredacted truth regarding the Jeffrey Epstein case."

52. After comparing the government's failure to release unredacted versions of the Epstein files to the FBI providing him with heavily redacted versions of the probable cause justification section of a warrant allegedly relied upon to search Defendants O'Keefe and OMG's office, Defendant O'Keefe assures his viewers that "The truth only comes out because brave people on the inside choose courage over silence." He concludes with a pitch for a separate upcoming video.

53. Both versions of the Video of the Secretly Recorded Audio that were disseminated by the Defendants falsely portrays a scheme which: (a) intentionally paints Mr. Rosas-Reyes as admitting cover-ups and confessing to having inside knowledge of the Epstein files as a result of his work as an employee of the FBI, (b) that he knows the Democratic Party is aware there are a lot of powerful Democrats listed on an actual client list in the Epstein files, including former President Clinton, and (c) that the Democratic Party and the White House is helping to cover up the files in order to avoid exposure. Mr. Rosas-Reyes, in fact, knew none of these assertions as truth, much less learned anything relating to the Epstein files as part of his contracting work with the FBI. Defendants knew or reasonably should have known that Mr. Rosas-Reyes did not possess any insider knowledge through his contract work at the FBI, particularly since he made that clear to Defendant Phillips during their dates. Contrary to Defendants' stated belief in the importance of releasing the unredacted, unvarnished, unfiltered, truth regarding the Epstein files, they manipulated and exaggerated the significance of Mr. Rosas-Reyes' words, placing a false varnish on his statements in order to publish a false narrative of their choosing. Had any actual investigative work been conducted by the Defendants they would have confirmed that Mr. Rosas-Reyes was an FBI contractor, did not work on any Epstein related matters at the FBI, and that what he stated was publicly known and widely held opinions circulating within the media. Indeed, it was publicly well-known that prior news reports had noted that President Clinton's name was listed in some of the Epstein files (not on any client list, which has never publicly surfaced) along with other notable persons including President Trump, Elon Musk and Prince Andrew. *See, e.g., https://www.pbs.org/newshour/ nation/a-list-of-powerful-men-named-in-the-epstein-files-from-elon-musk-to-former-prince-andrew* (last viewed August 26, 2026).

54. On Defendant's OMG website, the Video included the following headline: "FBI LEAKED AUDIO: FBI Senior Paralegal Specialist Confesses "There's Something Being Covered Up" in Jeffrey Epstein Case, Claims FBI Won't Release All Epstein Files Until "This Administration Is Over," Speculates "A Lot of Powerful Democrats" Are on Epstein Client List." In an article that accompanied the video, Defendants state that Mr. Rosas-Reyes "***admitted***" matters related to Epstein were being "held back" and that he did not think they would come out "until this administration is over" (emphasis added). It describes him "speaking to an OMG undercover journalist, revealing crucial information in the Jeffrey Epstein case is being withheld from the public and likely will not be released until the current administration leaves office." It further claims he "***accused*** leadership of breaking repeated promises of transparency." (emphasis added). At no point in the article are readers informed that Mr. Rosas-Reyes was unaware he was being secretly recorded without his consent. The Video also deliberately fails to mention any of Mr. Rosas-Reyes' statements to Defendant Phillips that he did not work on any matters related to Epstein and that he was only expressing his opinions based on publicly reported information.

55. Similarly, the Defendants' YouTube post of the Video has the title: "FBI Senior Specialist: Epstein Files Won't Be Released Until "This Administration Is Over." In the description the Defendants claim that Mr. Rosas-Reyes "***admits*** in leaked audio that the Bureau is deliberately delaying the release of Epstein-related files – until the current administration leaves office" (emphasis added). It also claims that in the Secretly Recorded Audio he "***confesses***" that "The FBI is 'protecting someone or some people'"; "A lot of powerful Democrats' may be on Epstein's client list"; "Bill Clinton is the first name he's heard"; "Promised transparency on JFK, MLK, and Epstein was all talk"; and "The agency only does

what it's told—not what justice demands" (emphasis added). The YouTube text concludes with a final apparent "confession" "None of the people in a position to answer the questions are willing to do it."

56. After promoting the false claims that Mr. Rosas-Reyes "admitted" and "confessed" to knowledge gained while working for the FBI, the Video contains a link to a paid sponsorship saying "American Independence Gold: Free Extra Gold with Qualifying Purchases" and a link to *https://okeefemediagold.com*.

57. In each of the descriptions for the posts to X, Instagram, and Facebook, Defendants repeat the false claim that in the Secretly Recorded Audio heard in the Video Mr. Rosas-Reyes "confesses" to information regarding the FBI's mishandling of the Epstein files.

*Publication of Termination Announcement Video by Defendants*

58. Defendants OMG and O'Keefe, with the apparent knowledge and/or consent of Defendant Phillips, posted a second video on September 8, 2025, on Defendant OMG's YouTube page at *https://www.youtube.com/watch?v=0OaKT713zy0*. In the follow-up video, they announce that Mr. Rosas-Reyes had been escorted from FBI Headquarters and terminated (Termination Announcement Video).

59. The headline on YouTube for the Termination Announcement Video proclaimed: "BREAKING NEWS: FBI Senior Official Mitchell Rosas TERMINATED & ESCORTED out of FBI Headquarters." At the time of the filing of this Complaint, this video has been viewed over 105,360 times and generated over 8,200 likes and 632 comments.

60. In the video, which is approximately 2:08 minutes long, Defendant O'Keefe announces: "Breaking news. Mitchell Rosas, the senior official from the FBI that we just released a video about today, has been escorted out of the FBI building today and terminated." He then claims

that Defendant OMG "just received" a statement from an FBI spokesperson which is displayed on a screen behind him. The e-mail is then posted fully to the screen as Defendant O'Keefe reads the portion that becomes highlighted in yellow as he reads it. The e-mail appears to have been sent to four persons, with the names "James" and "Raider" shown. It includes a date and time of transmission of Friday, September 5, 2025, at 12:51 PM. The e-mail begins, "Many thanks James. I will see what I can do here." It then continues, "In the meantime you all are free to report the individual here Mitchell Reyes Rosas [sic] has been dismissed / fired as of today, Friday, September 5. He was escorted from the building earlier." It is signed by Ben Williamson, Assistant Director, FBI Office of Public Affairs. A true and correct copy of the screenshot of the e-mail is reproduced below:

To: James; Raider; **+2 others** Fri 9/5/2025 12:51 PM

Many thanks James. I will see what I can do here.

In the meantime, you all are free to report the individual here
Mitchell Reyes Rosas has been dismissed / fired as of today,
Friday September 5. He was escorted from the building earlier.

Get Outlook for iOS

Ben Williamson
Assistant Director
FBI Office of Public Affairs

SUBSCRIBE FOR BREAKING NEWS @ OKEEFEMEDIAGROUP.COM

(highlight in original).

61. Defendant O'Keefe then says that "the FBI official also sent OMG a message trying to stop the publication of this damning audio on Epstein" and points to a screenshot of the message which is also posted on the screen behind him. The screenshot includes the second text message to Mr. Rosas-Reyes from the person who identified themselves "Raider". It is followed by the text Mr. Rosas-Reyes sent the evening of September 5, 2025, after he was removed from his

contract with the FBI. As Defendant O'Keefe reads Mr. Reyes-Rosas' text, the screenshot of the message is on the screen (Note: these messages reflect different time stamps from prior versions cited above. Upon information and belief, it is believed these copies reflect screen captures by an individual in a different time zone rather than a discrepancy in the time). In the video, Defendant O'Keefe highlights the e-mail address Mr. Rosas-Reyes provided for further communications with Defendant OMG and flashes the e-mail prominently on the screen. In fact, he encourages all his viewers to "e-mail that individual." Defendant O'Keefe then continues with additional commentary on Mr. Rosas-Reyes' text including that what is "interesting about this message is that he's claiming the words coming out of his mouth didn't happen. That he's not a government official even though he's been escorted out of the FBI building," adding, "Only one of those two things can be true. Very confusing message." Defendant O'Keefe concluded the Termination Announcement Video with his characterization of Mr. Rosas-Reyes as displaying "Not very professional behavior within our government."

62. The Termination Announcement Video falsely proclaimed it was presenting "breaking news" by announcing the termination of Mr. Rosas-Reyes by the FBI. In fact, the e-mail shown on the screen from the FBI public affairs official had been sent to the Defendants on the afternoon of Friday, September 5, 2025, which was three days before the Secretly Recorded Audio was posted online. Mr. Rosas-Reyes' texted response had also been sent on Friday as well. Defendants were aware of Mr. Rosas-Reyes' termination and his response for days before they posted the Secretly Recorded Audio and their video commentaries. Defendants again failed to acknowledge that Mr. Rosas-Reyes had expressly told Defendant Phillips that he was only a contractor who did not have specialized information and was only voicing opinions based on

what he heard in the news or that they had heavily redacted and edited his statements to take them out of context in order to support their sensationalized, and false, version of reality.

63. By withholding this information and context from their audience, Defendants ensured a false impression that Mr. Rosas-Reyes was actually admitting and confessing to conspiratorial activities of efforts being taken to hide information in the Epstein files from the public in order to protect powerful people, and that he was personally aware of this information due to his employment with the FBI. None of this was true, and the Defendants knew that at the time of the positing of their videos, or could have known had they actually conducted any investigative work.

*Termination List Video*

64. On or about October 13, 2025, Defendants OMG and O'Keefe posted a third video to their YouTube page at *https://www.youtube.com/watch?v=Jgx95TUE260* (last viewed August 21, 2026). with the title "10 Officials Fired in 2025 Following O'Keefe Media Group Investigations" ("Termination List Video). In this short video, Defendant O'Keefe runs through a list of ten individuals who were the subjects of videos published by him and Defendant OMG and who were fired as a result of their "investigative work." The eighth person Defendant O'Keefe names as part of this list of accomplishments is Mr. Rosas-Reyes, whose picture from his Hinge page is again posted in the video. Upon information and belief, no "investigative work" was conducted by the Defendants with respect to Mr. Rosas-Reyes.

65. Following his recitation of the names of the ten people Defendants OMG and O'Keefe claimed credit for getting fired, the Termination List Video turns to Defendant O'Keefe saying, "I have a dream that there's not just ten people exposed and fired, but hundreds, thousands of people in our government exposed and fired." He continues, speaking to his viewers, "You asked

for accountability, that's accountability. You say that's not enough accountability. I say, well, it's a start. We're headed in the right direction. But we would ask you, please send a tax-deductible contribution to our citizen journalism foundation if you like the idea of people's feet being held to the fire. If you like that people now have information about what all those officials have done. We live in a better world being armed with information. And these are just the people that our undercover reporters and sources have given to us. There's a whole lot more to expose. Stay tuned."

66. In the written description of the video the text claims "Our undercover work has led to major removals" and a list of the ten people mentioned by Defendant O'Keefe in the video is published with Mr. Rosas-Reyes listed at number eight as "FBI Official Mitchell Rosas." It then concludes, "You asked for accountability – OMG delivered." As of the time of the filing of this Complaint, this video has been viewed over 12,720 times and received over 2,300 likes and 158 comments.

67. This video, along with the Termination Announcement Video, demonstrates that Defendants knew that by posting their false content about Mr. Rosas-Reyes he was likely to get fired and, in fact, his removal/termination was a goal of their activities in order to, as they describe it, ensure "accountability."

68. It also provided the Defendants with fake or exaggerated "success" stories by which they could obtain more views of their videos and solicit donations from their supporters who believed, based on videos on matters such as the Secretly Recorded Audio, that Defendants had exposed individuals such as Mr. Rosas-Reyes as federal officials with knowledge of cover-ups within the government. Yet the Defendants knew, or should have known had they actually engaged in "investigative work", that none of this was true.

**COUNT ONE**
**DEFAMATION/DEFAMATION *PER SE*/DEFAMATION BY IMPLICATION**
**(Against All Defendants)**

69. Mr. Rosas-Reyes realleges and incorporates by reference paragraphs 8 to 68, above.

70. Defendants, among other actions, outright falsely and maliciously have stated and/or implied in their videos and articles that Mr. Rosas-Reyes was (a) a senior FBI official or analyst who, by virtue of his employment, had access to insider information regarding the federal government's processing of the Epstein files; (b) had knowledge of deliberate efforts, including by the White House, to cover up and withhold from the public information contained within the Epstein files, and (c) that these efforts encompassed the names of powerful members of the Democratic Party, such as former President Bill Clinton.

71. Defendants falsely and maliciously accused and/or implied in their videos and articles that Mr. Rosas-Reyes, divulged protected/privileged government information he learned through his employment with the FBI in violation of law, regulations or policies to unauthorized third parties.

72. These statements and their implications are objectively false statements of fact and constitute defamation, defamation *per se* and/or defamation by implication. They are neither rhetorical hyperbole, opinion, or loose commentary. Any objective reasonable viewer of the videos or reader of the written statements would construe them as assertions of fact capable of verification and portrayed him as odious, infamous, or ridiculous. Additionally, particularly by splicing short audio clips that are sometimes mere seconds from a two-hour conversation and which were presented out of context, the Defendants' actions created a defamatory inference that can reasonably be drawn from their statements and videos. Moreover, the Defendants, particularly OMG and O'Keefe, supplied additional, affirmative evidence to the public that

suggests that they intended and/or endorsed the defamatory inference. In particular, consumers of the statements of Defendants OMG and O'Keefe did, in fact, construe them in that manner.

73. The defamatory statements were disseminated to third parties and published online for public viewing by anyone with access to the Internet. The Video of the Secretly Recorded Audio and Termination Announcement Video that were posted on Defendant OMG and O'Keefe's social media platforms and websites have been viewed, at the time of the filing of this Complaint, nearly 2,000,000 times.

74. The Defendants failed to undertake reasonable or diligent efforts to conduct any type of investigative work to verify the accuracy of the defamatory information before disseminating or publishing it.

75. The defamatory statements have caused identifiable harm to Mr. Rosas-Reyes, not only to his employment (including loss thereof) but also to his personal and professional reputation and injured him in his trade, profession or community standing, as well as lowered him in the estimation of the community. These damages, which include serious mental distress, were reasonably foreseeable to the Defendants and were the understandable byproduct of their dissemination and publication of the defamatory statements. Upon information and belief, the prior similar activities that the Defendants have engaged in cause them to know, or that they should have reasonably known, that their actions would cause Mr. Rosas-Reyes to lose his employment.

76. The Defendants are liable for compensatory damages, as well as for punitive damages given the deliberate and outrageous nature of the defamation. The Defendants had actual knowledge of the falsity of the statements at issue. The publication of the statements were knowingly false and made with actual malice.

**COUNT TWO**
**FALSE LIGHT**
**(Against All Defendants)**

77. Mr. Rosas-Reyes realleges and incorporates by reference paragraphs 8 to 68, above.

78. Defendants, among other actions, outright falsely and maliciously stated and/or implied in their videos and articles that Mr. Rosas-Reyes was (a) a senior FBI official or analyst who, by virtue of his employment, had access to insider information regarding the federal government's processing of the Epstein files; (b) had knowledge of deliberate efforts, including by the White House, to cover up and withhold from the public information contained within the Epstein files, and (c) that these efforts encompassed the names of powerful members of the Democratic Party, such as former President Bill Clinton.

79. Defendants falsely accused or implied in their videos and articles that Mr. Rosas-Reyes divulged protected/privileged government information he learned through his employment as a "senior official" or "analyst", neither of which he was, with the FBI in violation of law, regulations or policies to unauthorized third parties.

80. These statements and their implications are objectively false statements of fact, especially since they represent spliced short audio clips that are sometimes mere seconds in length yet taken from a two-hour conversation and were presented out of context. The Defendants' actions created a defamatory inference that can reasonably be drawn from their statements and videos and place Mr. Rosas-Reyes in a false light which would be objectionable to any reasonable person. In particular, consumers of the statements of Defendants OMG and O'Keefe construed the false light Mr. Rosas-Reyes was placed in as fact.

81. The Defendants failed to undertake reasonable or diligent efforts to conduct any type of investigative work to verify the accuracy of the information that placed Mr. Rosas-Reyes in a false light before disseminating or publishing it.

82. These false statements were disseminated to third parties and published online for public viewing by anyone with access to the Internet. The Video of the Secretly Recorded Audio and Termination Announcement Video that were posted on Defendant OMG and O'Keefe's social media platforms and websites have been viewed, at the time of the filing of this Complaint, nearly 2,000,000 times.

83. The false light which these statements and their implication cast on Mr. Rosas-Reyes has caused identifiable harm to Mr. Rosas-Reyes, to include serious mental distress. These damages were reasonably foreseeable to the Defendants and were the understandable byproduct of their dissemination and online publication of the videos and statements accompanying the videos. Upon information and belief, the prior similar activities that the Defendants have engaged in cause them to know, or that they should have reasonably known, that their actions would cause Mr. Rosas-Reyes to lose his employment.

84. The Defendants are therefore liable for compensatory damages, as well as for punitive damages given the deliberate and outrageous nature of the false light which they created about Mr. Rosas-Reyes. The Defendants had, or should have had, actual knowledge of the falsity of the statements at issue. The publication of those statements were knowingly false and made with actual malice.

**COUNT THREE**
**FRAUDULENT MISREPRESENTATION**
**(Against All Defendants)**

85. Mr. Rosas-Reyes realleges and incorporates by reference paragraphs 8 to 68, above.

86. At the behest of Defendants OMG and O'Keefe, Defendant Phillips knowingly and deliberately fraudulently misrepresented herself to Mr. Rosas-Reyes for the purpose of targeting and entrapping him into making remarks that could be distorted, edited, or manipulated for harmful purposes. Defendant Phillips created a false version of herself through her Hinge profile in the persona of "Skylar." From the outset and with a tortious or other injurious acts as a motivation, throughout the course of her interactions with Mr. Rosas-Reyes prior to and during their two dates, Defendant Phillips deliberately falsely portrayed her political views and reasons for wanting to go on a date with him.

87. Defendant Phillips deliberately and fraudulently misrepresented her intentions in creating a fake profile on Hinge and violated the company's Terms of Use Agreement and Community Guidelines, including by misrepresenting her identity and intentions, her economic motive for going on a date, and not acting "authentically and with clear intentions." Defendant Phillips was never interested in seeking a romantic connection, nor was she ever personally interested in Mr. Rosas-Reyes. To the contrary, she was from the outset part of an intentionally orchestrated operation targeting individuals who were believed to work for the U.S. government and/or held views that were perceived as ideologically/politically (generally liberal) different than the Defendants.

88. Defendant Phillips' false representations were material to inducing Mr. Rosas-Reyes to engage with her through the Hinge App, communicate with her about potential dates, spend time on and pay for two dates with her, and elicit him to talk about the Epstein files in a manner that

could be falsely presented as if he was speaking based on insider information obtained through his employment with the FBI (which he was not) and which he would not have done had he known her actual tortious or other injurious motivation.

89. Defendants OMG and O'Keefe at all times intended for Defendant Phillips to intentionally deceive Mr. Rosas-Reyes in order to obtain information which could be used to create damaging and manipulated videos and articles to support the extreme right-wing agenda, profits, and fundraising efforts of Defendants OMG and O'Keefe. Upon information and belief, the prior similar activities that the Defendants have engaged in cause them to know, or that they should have reasonably known, that their actions would cause Mr. Rosas-Reyes to lose his employment.

90. Mr. Rosas-Reyes not only paid for the dates with the woman he knew as "Skylar," but who was in fact Defendant Phillips, but as a natural and proximate consequence of Defendant Phillips' fraudulent misrepresentations he has suffered serious mental distress, the loss of his employment, and substantial damage to his personal and professional reputation.

91. The Defendants are therefore liable for compensatory and any applicable punitive damages.

**COUNT FOUR**
**CONSPIRACY TO COMMIT FRAUDUENT MISREPRESENTATION**
**(Against All Defendants)**

92. Mr. Rosas-Reyes realleges and incorporates by reference paragraphs 8 to 68, above.

93. The Defendants conspired to have Defendant Phillips knowingly and deliberately fraudulently misrepresented herself to Mr. Rosas-Reyes for the purpose of targeting and entrapping him into making remarks that could be distorted, edited or manipulated for harmful purposes. They also conspired to have Defendant Phillips create a false version of herself

through a Hinge profile in the persona of "Skylar." From the outset and with a tortious and other injurious motivation in mind, the Defendants conspired to ensure that throughout the course of Defendant Phillips' interactions with Mr. Rosas-Reyes, she would deliberately falsely portray her political views and reasons for wanting to go on a date with him.

94. The Defendants deliberately conspired to have Defendant Phillips fraudulently misrepresent her intentions in creating a fake profile on Hinge and violated the company's Terms of Use Agreement and Community Guidelines, including by misrepresenting her identity and intentions, her economic motive for going on a date, and not acting "authentically and with clear intentions." Defendant Phillips was never interested in seeking a romantic connection, nor was she ever personally interested in Mr. Rosas-Reyes. To the contrary, the Defendants conspired from the outset to intentionally orchestrate operations targeting individuals who were believed to work for the U.S. government and/or held perceived views that were ideologically/politically (generally liberal) different than the Defendants.

95. Defendants OMG and/or O'Keefe employed or contracted with Defendant Phillips, and financially compensated her, for the purpose of targeting former or current civil servants or contractors such as Mr. Rosas-Reyes in order to entrap them into making inflammatory and damaging remarks that could be deliberately manipulated and/or falsely portrayed in sensationalized videos that would be posted online. The Defendants conspired with each other to knowingly provide Mr. Rosas-Reyes with false information in order to secretly unlawfully record his conversations without consent and distribute selected excerpts and clips without his authorization.

96. As a natural and proximate consequence of the Defendants' conspiracy to commit fraudulent misrepresentations, Mr. Rosas-Reyes has suffered serious mental distress, the loss of

his employment, and substantial damage to his personal and professional reputation. Upon information and belief, the prior similar activities that the Defendants have engaged in cause them to know, or that they should have reasonably known, that their actions would cause Mr. Rosas-Reyes to lose his employment.

97. The Defendants are therefore liable for compensatory and any applicable punitive damages.

**COUNT FIVE**
**TORTIOUS INTERFERENCE WITH EMPLOYMENT RELATIONSHIP**
**(Against All Defendants)**

98. Mr. Rosas-Reyes re-alleges and incorporates by reference paragraphs 8 to 68, above.

99. At the request or with the assistance of Defendants OMG and O'Keefe, Defendant Phillips created a false version of herself through a Hinge profile in the persona of "Skylar," which knowingly violated the company's Terms of Use Agreement and Community Guidelines,

100. As a direct result of her violating the Hinge Terms of Use Agreement and Community Guidelines, Defendant Phillips obtained access to Mr. Rosas-Reyes' dating profile. After making contact, she learned that he worked for DOJ in some capacity and that he previously had worked for various other federal entities. During their two dates she purposefully and with tortious and injurious motivation sought information about the nature of his work for the government, specifically his current work with the DOJ and FBI.

101. Defendant Phillips repeatedly feigned a legitimate interest in the Epstein files and encouraged Mr. Rosas-Reyes to provide his opinions about why the documents had not been fully released and whose names might be contained in such files or on a client list. Defendant Phillips secretly and unlawfully, without Mr. Rosa-Reyes' consent or knowledge, and with a tortious and injurious motivation recorded one or more of their dates and then provided those

recordings to Defendants OMG and O'Keefe. From past knowledge or experience, Defendant Phillips was fully aware that Defendants OMG and O'Keefe intended to selectively edit and/or manipulate the recordings and disseminate them to the federal government as well as post clips on the Internet.

102. Despite being explicitly told by Mr. Rosas-Reyes that he had no inside knowledge of the Epstein files or their contents as a result of his work with the FBI, where he was not an employee, and that he was only providing his private, personal opinions and thoughts, Defendant Phillips nonetheless assisted Defendants OMG and O'Keefe in defaming Mr. Rosas-Reyes and/or placing him in a false light. Upon information and belief, the Defendants, through their own direct past activities or experiences, knew or should have known that individuals targeted by the Defendants in this manner often lost their employment when Defendants OMG and O'Keefe disseminated or posted the information online.

103. Upon information and belief, when the Defendants disseminated or posted online secret unlawful recordings made by undercover operatives such as Defendant Phillips it was intended the targeted victim would be terminated from their employment. As a direct result of Defendant Phillips' secretly recording Mr. Rosas-Reyes' private, personal opinions and statements, without his consent or knowledge, and because Defendants OMG and O'Keefe disseminated information to the FBI and expressed their intent to post selective clips online, Mr. Rosas-Reyes was removed from his FBI contract and soon thereafter terminated by his employer Guidehouse. The removal and termination of Mr. Rosas-Reyes was solely as a result of the Defendants tortious and injurious actions and was an intended proximate cause of their activities.

104. Defendants OMG and O'Keefe publicly confirmed their malicious intent in the Termination List Video where Defendant O'Keefe took credit for Mr. Rosas-Reyes's termination

and proclaimed, "I have a dream that there's not just ten people exposed and fired, but hundreds, thousands of people in our government exposed and fired."

105. As a natural and proximate consequence of Defendants actions, Mr. Rosas-Reyes has suffered actual damages due to his loss of employment, as well as has had difficulty obtaining or been unable to obtain new employment, particularly at the level of compensation he previously earned.

106. The Defendants are therefore liable for compensatory and any applicable punitive damages.

**COUNT SIX**
**VIOLATION OF 18 U.S.C. § 2511 AND D.C. CODE § 23-542 – WIRE TAP ACTS**
**(Against All Defendants)**

107. Mr. Rosas-Reyes realleges and incorporates by reference paragraphs 8 to 68, above.

108. On one or more occasions, Defendants knowingly and secretly recorded Mr. Rosas-Reyes in Washington, D.C. without his knowledge, consent or authorization. Had he known, Mr. Rosas-Reyes would have objected to the recording. Even though his dates with Defendant Phillips took place in public restaurants, there was substantial surrounding noise or lack of patrons and Mr. Rosas-Reyes reasonably believed he was engaging in private conversations with a potential romantic partner that were shielded from the hearing of others and that there existed a legitimate expectation of privacy. He had no reason to believe his private conversations were being secretly recorded or that Defendant Phillips was coordinating with Defendants OMG and O'Keefe to deliberately disseminate his personal opinions and thoughts regarding the Epstein files, or any other matter, and that they would tortiously, maliciously and falsely portray him in a manner that would be harmful.

109. Notwithstanding the District of Columbia being a one-party consent jurisdiction, 18 U.S.C.§ 2511 and D.C. Code § 23-542 nonetheless prohibit the interception and recording of a communication if it was for the purposes of committing a tortious or other injurious act.

110. From the outset and at all times throughout the interactions between the Defendants and Mr. Rosas-Reyes, the Defendants were tortiously motivated to secretly record Mr. Rosas-Reyes without his knowledge or consent by way of fraudulent misrepresentation (and/or conspiracy) and under false pretenses in order to then manipulate, edit, and splice together his private personal comments in order to create and/or imply a false context to such comments. Through such actions, the Defendants published false or exaggerated verbal and written commentary that was designed to place Mr. Rosas-Reyes in a false light and/or defame him, and to use such recordings to interfere with his employment relationship, all of which are tortious or other injurious acts.

111. Defendants intended from the outset and at all times to provide selectively edited and misleading recordings to the FBI and should reasonably have known or did know (and intended), that this would lead to the termination of Mr. Rosas-Reyes' employment. This exception to the "one-party" consent rule is content-neutral and serves a significant government interests in preventing tortious actions.

112. As a natural and proximate consequence of the Defendants' tortious and other injurious acts through use of the recordings, Mr. Rosas-Reyes did in fact suffer loss of his employment.

113. The Defendants are therefore liable for actual damages, to include any profits made by the violations, along with punitive damages and attorneys' fees and costs given the deliberate and outrageous nature of the resulting defamation and/or false light. Furthermore, Mr. Rosas-Reyes suffered non-reputation damages including incurring out-of-pocket expenses.

WHEREFORE, Plaintiff Mitchell Rosas-Reyes prays that this Court:

(1) Award him an amount of damages to be determined at trial, but no less than $75,000;

(2) Awards reasonable costs and attorney's fees as provided in 28 U.S.C. § 2412 (d) and any other applicable law;

(3) Expedites this action in every way pursuant to 28 U.S.C. § 1657 (a); and,

(4) Grants such other relief as the Court may deem just and proper.

Dated: August 27, 2026

Respectfully submitted,

*s/Mark S. Zaid*

Mark S. Zaid, Esq.
D.C. Bar #440532
Bradley P. Moss, Esq.
D.C. Bar #975905
Geoffrey S. DeWeese
(*Pro Hac Vice* pending)
Mark S. Zaid, P.C.
1250 Connecticut Avenue, N.W.
Suite 700
Washington, D.C. 20036
(202) 498-0011
Mark@MarkZaid.com
Brad@MarkZaid.com
Geoffrey@MarkZaid.com

Attorneys for the Plaintiff